MARY PALUSZEK, f/k/a Mary Cox, Plaintiff-Appellee, v. SAFECO IN-
SURANCE COMPANY OF AMERICA, Defendant-Appellant.

First District (3rd Division)   No. 86—564

Opinion filed June 3, 1987.—Rehearing denied September 30, 1987.

Clausen, Miller, Gorman, Caffrey & Wittous, P.C., of Chicago (James T. Ferrini, Richard A. Buchanan, and Lisa Marco Kouba, of counsel), for appellant.

Wood, Lucksinger & Epstein, of Chicago (Alan E. Sohn and John J. Bollman, of counsel), for appellee.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

Defendant Safeco Insurance Company appeals from an order granting summary judgment to plaintiff Mary Cox on the issue of coverage under the repair or replacement cost provision of her homeowner's insurance policy. Defendant also appeals from the trial court's finding of vexatious and unreasonable delay in payment of the claim, the penalty assessed therefore, and an award of attorney fees to plaintiff. Plaintiff has cross-appealed, urging that the amount of attorney fees awarded was inadequate.

Plaintiff Mary Paluszek, formerly Mary Cox, and her ex-husband Jody Cox purchased homeowner's insurance from defendant after purchasing a home in February 1980. The policy provided coverage against loss caused by fire. Jody Cox was originally a plaintiff in this case but his claim was dismissed with prejudice for repeatedly violating court orders to appear for his deposition. The Cox home suffered extensive damage as a result of a fire on December 12, 1980. The fire department listed the cause of the fire to be "undetermined," although the origin of the fire was in the kitchen and more specifically near the coffee maker.

Representatives of defendant visited the home on the same day the fire occurred and advanced the Coxes $3,200 within two days to cover living expenses. On December 15, 1980, defendant's adjuster, Leonard Cooper, discussed with Jody Cox an estimated timetable for working up the claims for additional living expenses, content losses and the scope of repairs. Cooper was unable to obtain a statement from plaintiff at this time because she was too emotionally upset.

Defendant's property supervisor, James Schild, requested Cooper

to employ the services of an investigator to determine the cause of the fire. If the investigation revealed that the fire was caused by the coffee maker, Schild was concerned with recovering the amount of the loss via subrogation. Upon inspection of the premises, the investigator noted indications of unusual burn patterns at the floor level which would be abnormal for a fire that allegedly started at counter-top level. The investigator sent samples of the kitchen tile and living room carpet to a lab for analysis. The test results revealed that the samples contained gasoline. Additionally, the second place of origin of the fire, a crawl space, was apparently concealed after the fire was extinguished. A crawl space carpet sample also contained gasoline. The investigator issued a report to defendant which stated that he believed the fire to be of an incendiary origin. On February 24, 1981, defendant sent plaintiff's counsel a copy of the investigator's report.

While investigation of the fire continued, defendant continued to adjust the loss. Cooper attempted to get content evaluation sheets and proofs of loss from the Coxes in January 1981. Cooper made several unsuccessful attempts to get signed statements from both Coxes. Upon receiving proofs of loss, counsel for defendant requested that the Coxes be examined under oath, as provided in the policy. The Coxes twice requested that the examinations be rescheduled, and on April 7, 1981, defendant's counsel wrote that no further action would be taken on the claim until the Coxes complied with the cooperation clause in the policy. The Coxes were examined under oath on April 15 and 16, but did not return the signed transcripts to defendant for approximately another month.

On July 22, 1981, after reviewing a financial and character report on the Coxes, Schild decided that although defendant could prove that the fire had an incendiary original and that the Coxes met the opportunity requirement, it could not prove a motive for intentionally setting the fire, all of which are necessary elements to establish arson. On this basis, Schild recommended that the investigation be closed and coverage afforded. The Coxes were informed of defendant's decision on July 29, 1981, the same day the decision to pay the claim was made.

On August 4, 1981, Cooper wrote plaintiff's counsel, setting forth three bids for repair received from contractors. The contractor selected by the Coxes submitted a bid of $52,955, while the contractor selected by defendant submitted a bid for $39,788.54. An independent contractor, Cameo Construction Company, submitted a bid of $40,974.95. Cooper suggested that Cameo be retained to perform the repairs, offering to update the Cameo bid to take into consideration

inflation since the date of loss. Plaintiff's counsel stated that he could not immediately respond to this offer.

With regard to the contents claim, defendant paid $28,841 to the Coxes on September 3, 1981. With regard to an additional living expense claim, defendant was not provided with the information necessary to determine any additional amount owed.

On November 6, 1981, because defendant had not received a response regarding Cameo's bid and no repairs had been made on the house, it sent the Coxes a check for $36,371.30, representing the actual cash value of the dwelling. On December 4, 1981, defendant sent the Coxes an additional check for $2,750.94 to correct an error which it discovered in the calculation of the original cash value. This total payment was in compliance with the policy, which reads in relevant part:

> "b. When the full cost of repair or replacement is more than $1000 or more than 5% of the whole amount of insurance applicable to said building structure for the peril causing the loss, this company shall not be liable for more than the actual cash value of the damaged property unless and until actual repair or replacement is completed."

On December 3, 1981, an agreement regarding Cameo's updated repair bid of $41,286.56 was reached by the parties. On December 30, 1981, the Coxes sold their home in "as is" condition without any repairs being made and without any notice to defendant. On January 11, 1982, plaintiff's counsel acknowledged receipt of the payment of the actual cash value and stated he understood that no further payments were due on the policy until the repairs were actually made.

On February 26, 1982, plaintiffs brought this action to collect the difference between the agreed cost of repairs of the dwelling, which was $41,286.56, and the amount paid by defendant as the actual cash value. The difference is $2,064.32. The complaint also alleged that defendant was liable for "up to $13,000" for additional living expenses. The Coxes did not submit a claim for additional living expenses until two months after filing suit, and that claim was for $11,017.59. Plaintiff subsequently amended her claim eliminating several credits taken for normal, as opposed to additional, living expenses. She accepted payment on this claim in the amount of $4,919.40.

When defendant learned through Cameo that no repairs had been made on the house because the Coxes had sold it "as is," Cooper sought confirmation of this information. On June 14, 1982, plaintiff's counsel informed Cooper that the house was sold in December and

that the new owner, a contractor, had performed the repairs himself. Cooper notified plaintiff that since the insured expended nothing in the repair of the structure, defendant did not owe any additional money under the repair and replacement cost condition.

Defendant filed a motion for summary judgment in December 1983, citing the repair and replacement provision of the policy and plaintiff's response to a request to admit facts wherein she admitted that she did not repair the house before it was sold. The trial court denied defendant's motion for summary judgment, finding that the policy did not require that the insured or anyone in her behalf do the repair or replacement or that the insured retain ownership of the property, so long as the actual repair or replacement was completed.

Plaintiff subsequently filed a motion for summary judgment as to liability only. The trial court granted plaintiff's motion and set the matter for trial on plaintiff's claim of vexatious and unreasonable delay. The trial court ruled in favor of plaintiff, awarding her $2,064.32 for coverage under the insurance policy and assessing a $10,000 penalty against defendant under section 155 of the statute governing penalties available to an insured where an insurer "unreasonably and vexatiously" delays payment of a claim. (Ill. Rev. Stat. 1983, ch. 73, par. 767.) Plaintiff's counsel sought $21,000 in fees, and the court awarded him $6,500 in fees and costs.

In a post-trial motion, defendant attempted to reduce the award because Jody Cox had been dismissed from the lawsuit. Defendant also objected to the judgment order because it listed the wrong entity as defendant and urged the trial court to reduce the statutory penalty awarded to comply with the statute. Describing these motions as dilatory, the court denied both motions and assessed an additional $300 attorney fees for plaintiff's counsel's time in responding to the motion.

■ On appeal, defendant first argues that the trial court erred in not granting it summary judgment as to liability for the repair and replacement costs when the insured sold the premises before any repairs had been made. Defendant maintains that since plaintiff did not make the repairs, and sold the home "as is," the award of $2,063.23, the difference between the agreed upon repair and replacement cost and the actual cash value already paid by defendant, results in a windfall profit from plaintiff's policy.

The provision of the policy does not expressly say who is to make the repairs for defendant to still be held liable. The provision specifically states "this company shall not be liable for more than the actual cash value of the damaged property unless and until actual repair or

replacement is completed."

In construing the meaning of an insurance contract, it is crucial to consider the fundamental purpose of insurance coverage. The proceeds of an insurance contract are indemnity for actual loss sustained by the insured. (See *Third Establishment, Inc. v. 1931 North Park Apartments* (1981), 93 Ill. App. 3d 234, 417 N.E.2d 167.) Unless and until an actual loss is sustained and proved by the insured, he is not entitled to reimbursement by the insurer.

■ In the present case, defendant paid plaintiff the actual cash value of her house in the amount of $39,122.14 in November 1981. Under the terms of the policy, this was all defendant was obligated to pay unless and until repairs were completed. Therefore, defendant fulfilled its obligation for the loss already suffered. Consistent with its obligation under the policy, defendant was willing to reimburse plaintiff for any further pecuniary loss she sustained in making the needed repairs. Defendant was not willing and not required to reimburse plaintiff for repairs if someone else suffered a pecuniary loss in effecting such repairs.

Plaintiff, before making any repairs, and having already received from defendant the actual cash value of the house, sold it in "as is" condition. There is no dispute that defendant was willing to pay the repair cost upon agreement of a contractor and actual performance of the work. Plaintiff, however, elected to sell the home and now is attempting to collect for repairs she did not make. To make this additional payment for repairs would result in a profit to the insured. If we allowed the insured to profit from her insurance, we would contravene the very fundamentals of insurance law. We believe that the provision requires that repairs be made by the insured, this being the only result consistent with the goal of indemnification for actual loss suffered.

■ We believe that this case should be governed by fundamental principles of property insurance. Property insurance is not insurance on the property itself, but rather on the interest of the person insured. Insurance coverage does not run with the property when transferred. (*Third Establishment, Inc. v. 1931 North Park Apartments* (1981), 93 Ill. App. 3d 234, 417 N.E.2d 167; *Patterson v. Durand Farmers Mutual Fire Insurance Co.* (1940), 303 Ill. App. 128, 24 N.E.2d 740.) An insurance contract is a contract to pay an amount of money equal to the loss the insured party has suffered. As stated by the *Patterson* court: "Indemnity against loss is the essence of a contract of insurance and the undertaking is personal to the insured. The policy is not an insurance of the specific thing without regard to the

ownership but is a specific agreement of indemnity with the person insuring against such loss or damage as he may sustain." 303 Ill. App. 128, 138, 24 N.E.2d 740.

Consistent with this principle, defendant is not obligated to reimburse plaintiff for repairs to the dwelling performed and paid for by another party. The contract for insurance is personal to the insured party. Defendant does not insure the subsequent owner and therefore cannot reimburse plaintiff herein for pecuniary loss suffered by the subsequent owner.

Two Illinois cases have interpreted almost identical insurance repair and replacement provisions. (*Higginbotham v. American Family Insurance Co.* (1986), 143 Ill. App. 3d 398, 493 N.E.2d 373; *National Tea Co. v. Commerce & Industry Insurance Co.* (1983), 119 Ill. App. 3d 195, 456 N.E.2d 206.) While these cases are not determinative of the issue before us, their reasoning and holdings are instructive. In both cases, it was undisputed that the repairs or replacement were never made, and the issue was whether the insured could collect the repair or replacement cost after having shown an intent to make the repairs. The *National Tea* case held that an almost identical provision to the one before us " 'discloses a clear and unambiguous undertaking to pay the insured the actual cash value of the damaged property at the time of loss, less depreciation, unless the insured actually repaired, rebuilt or replaced within a reasonable time.' " (119 Ill. App. 3d 195, 201, 456 N.E.2d 206, quoting *Lerer Realty Corp. v. MFB Mutual Insurance Co.* (5th Cir. 1973), 474 F.2d 410.) While these cases are distinguishable because the repairs were never made, the courts' interpretation of the provision helps us reach our conclusion. Our focus, as was the court's in *National Tea,* is on the insured's action. Unless the insured has actually suffered a loss, the insurance company's liability is limited to the actual cash value.

Plaintiff relies on a New Jersey case, *Ruter v. Northwestern Fire & Marine Insurance Co.* (1962), 72 N.J. Super. 467, 178 A.2d 640, as a factually similar case where the insured sold the damaged property and then attempted to collect the repair and replacement cost. There, the court refused to uphold the trial court's ruling that plaintiff had incurred no loss under the repair and replacement provision because she had expended no money to repair or replace the property but had sold it in damaged condition. The present case is distinguishable because, in *Ruter*, the parties agreed that the purchaser would apply the entire purchase price towards the erection of a building on the premises. Unlike the present case, the agreement in *Ruter* precluded the insured from making a profit on the sale and collection of the in-

surance proceeds. For the foregoing reasons we find that the repair and replacement provision of the insurance contract was only applicable if the insured suffered a loss and thus defendant's liability ceased with payment of the actual cash value in accordance with the policy. The trial court erred in not granting summary judgment in favor of defendant.

■ Plaintiff contends that even if the repairs had to be completed by her to be entitled to recovery, defendant's unreasonable investigation and delay should not be permitted to frustrate the insured's intent to rebuild and repair her damaged home and recover the cost thereof. We find this argument to be without merit. The record demonstrates that upon accepting coverage, the parties discussed three bids for repair and replacement and defendant immediately afforded coverage under the Cameo construction bid. Plaintiff did not respond to this offer, and, more than three months later, defendant sent plaintiff a check for the actual cash value of the property. Furthermore, an intent to make the necessary repairs by the insured is not sufficient to satisfy the repair and replacement cost endorsement of the insurance policy. *Higginbotham v. American Family Insurance Co.* (1986), 143 Ill. App. 3d 398, 493 N.E.2d 373.

■ The trial court found that defendant was responsible for an unreasonable and vexatious delay in the settlement and payment of the insurance coverage for which it was obligated and assessed a penalty under section 155 for the delay. We do not agree with this conclusion. Defendant was entitled and even obligated to investigate the investigator's conclusion of an incendiary origin of the fire. Furthermore, upon defendant's acceptance of coverage on July 29, 1981, any delay in settlement was due to the delays or lack of information provided by plaintiff. Because plaintiff had not responded to defendant's offer to use an updated version of Cameo's repair bid, defendant sent the actual cash value to cover its liability. Furthermore, plaintiff claimed that defendant owed her money for additional living expenses. The record shows, however, that plaintiff never submitted information to defendant regarding the claim. When plaintiff finally did submit her claim, it was inflated by almost $6,000. As soon as the claim was properly adjusted, defendant paid the claim. Finally, upon becoming aware that plaintiff had sold the house without making any repairs, there existed a legitimate dispute as to the amount due under the policy. Upon review of all the evidence, we find that defendant was not responsible for unreasonable and vexatious delay, and we therefore set aside the decision of the trial court so holding and vacate the penalty assessed for the delay.

In view of our holding on the issue of coverage liability, and our finding that defendant was not unreasonable or vexatious in delaying payment, we also set aside the award of attorney fees to plaintiff. We therefore need not address plaintiff's cross-appeal.

For the foregoing reasons, the orders of the circuit court granting summary judgment for plaintiff on liability, entering judgment for $2,064.32 for plaintiff and assessing a penalty against defendant, and awarding attorney fees to plaintiff are reversed. Judgment is hereby entered for defendant.

Judgment reversed.

RIZZI and WHITE, JJ., concur.